# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **JASON CANTRELL**, <br><br> *Plaintiff,* <br><br> *v.* <br><br> **KANDICE GARDNER**, individually and in her official capacity, <br> **ANDRE PITTS**, individually and in his official capacity, <br> **JAMAL HUNTER**, individually and in his official capacity, and <br> **THE CITY OF FOREST PARK**, <br><br> *Defendants.* | **Civil Action No.** |

## MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Plaintiff Jason Cantrell moves the Court under Rule 65 for a preliminary injunction barring Defendants from enforcing the provision in his Sound Amplifying Device Permits stating "If complaints are received about noise level, this Permit will become null and Void," and from revoking or threatening to revoke those permits, or citing Plaintiff, based on listener complaints alone, absent objective, content-neutral criteria such as measurable decibel levels exceeding reasonable limits.

## INTRODUCTION

The City of Forest Park issued Jason Cantrell a Sound Amplifying Device Permit to use amplification on public sidewalks, a traditional public forum where

Page **1** of **17**

the First Amendment's protections are at their zenith. On its face, the permit appeared to authorize Mr. Cantrell's protected religious and expressive speech. But buried within it was a heckler's veto proviso: *If complaints are received about noise level, this Permit will become null and Void.*"

That proviso gives a third party, namely, any listener who objects, a unilateral trigger to extinguish Mr. Cantrell's rights. For that reason, his permit exists in name only. The moment any person, for any reason, lodges a complaint, the permit is automatically revoked. No decibel measurement is required. No objective standard must be met. No inquiry into whether the "noise" was actually excessive ever takes place. A single complaint, whether motivated by genuine concern over volume or by hostility toward Mr. Cantrell's religious message, is enough to trigger revocation. The permit is not a permit at all; it is an illusion of permission with final say given any complaining listener.

None of this is conjecture. The heckler's veto was applied. The City revoked Mr. Cantrell's permit, cited him, and prosecuted him, not because his amplification was objectively too loud, but because complaints were received. The very harm the First Amendment forbids has already occurred and will recur absent this Court's intervention. Plaintiff therefore seeks a preliminary injunction to restore his constitutional right to amplify his protected speech in a traditional public forum under objective, content-neutral standards.

## STATEMENT OF FACTS

The City of Forest Park has a practice and policy of conditioning sound amplification permission upon listener reaction, revoking valid Sound Amplifying Device Permits ("Permit") upon the mere request of any dissatisfied listener. Verified Complaint at ¶ 1.  Jason Cantrell, the Plaintiff in this case, is a Forest Park permit holder who uses his Permit to preach the gospel at A Preferred Women's Health Center, an abortion clinic in Forest Park, Georgia. *Id.* at ¶¶ 2, 24. Mr. Cantrell has applied for and received Permits from Forest Park for this exact use for many years. *Id.* at ¶¶ 26, 27. However, each of Mr. Cantrell's Permits, like many others issued by the City, contain additional language stating, "If complaints are received about noise level, this Permit will become null and Void." *Id.* at ¶ 4. (Hereinafter the "Complaint Restriction").

On July 31, 2025, Mr. Cantrell was told by Forest Park Police officers that they had received complaints about his activities and that his Permit would be revoked if he did not lower his volume. *Id.* at ¶¶ 34-39. Mr. Cantrell agreed to lower his volume, but insisted on the validity of his Permit and conviction to preach the gospel to mothers considering abortion. *Id.* at ¶¶ 40, 41. Forest Park Police cited Mr. Cantrell anyway, and informed him that his permit, issued for July 1, 2025, through September 30, 2025, had been revoked. *Id.* at ¶¶ 32, 42.

Mr. Cantrell fought his citation, and after patiently waiting months for his day in court, filing multiple pleadings for his defense, and appearing in municipal

court ready to litigate his case, the City dismissed the charges on the morning of his scheduled trial. *Id.* at ¶¶ 44-49. Because of that dismissal, Mr. Cantrell was never given a chance for a judge to rule on his constitutional arguments in that case, and with the unconstitutional provision still in force, Forest Park Police have continued to threaten Mr. Cantrell with reports of complaints received and revocation of his Permit. *Id.* at ¶ 51.

This has caused a tangible chilling and repression of Mr. Cantrell's protected, religious speech. Mr. Cantrell is constantly trying to lower his amplification volume to appease officers (who refuse to employ an objective measurement of his sound, *see id.* at ¶¶ 39, 70) and anonymous complainants. *Id.* at ¶¶ 52-55, 67. Mr. Cantrell, for his part, has no idea if those complaints are based on his volume or his message as his speech is religiously motivated and politically charged and is thus likely to cause offense. *Id.* at ¶ 65.

Because Mr. Cantrell's case was dismissed without ruling on his motions, his speech remains significantly chilled. A single upset passerby can submit a complaint, and he would yet again be subject to months of litigation, not because of his own transgression of an objective measure like decibels or time-of-day, but because a "complaint was received."

## PRELIMINARY INJUNCTION STANDARD

To obtain a preliminary injunction, a moving party must demonstrate four factors: a substantial likelihood of success on the merits; irreparable injury absent

the injunction; that the threatened injury to the movant outweighs any harm to the opposing party; and that the injunction would not be adverse to the public interest. *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Here, however, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *Ala. Democratic Conf. v. AG*, 838 F.3d 1057, 1063 (11th Cir. 2016) (quoting *United States v. Playboy*, 529 U.S. 803, 816 (2000)).   Thus, even at this preliminary stage, Defendants must demonstrate that their restriction on speech is constitutional. *See Ashcroft v. ACLU*, 542 U.S. 656, 665-66 (2004) (holding government bears burden of proof at trial on constitutionality of challenged speech restriction, and plaintiff must be deemed likely to prevail at preliminary injunction stage unless government meets its burden); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("The burdens at the preliminary injunction stage track the burdens at trial.").

As demonstrated below, Mr. Cantrell readily satisfies each factor, and Defendants cannot meet their burden of justifying their unconstitutional restriction on his speech.

## ARGUMENT

### I.   Plaintiff Is Likely to Succeed on the Merits.

Likelihood of success on the merits has long been recognized as the most important preliminary injunction factor, especially when a plaintiff alleges an injury to their First Amendment rights. *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. Of Registration & Elections*, 446 F. Supp. 3d 1111, 1125 (N.D. Ga. 2020) (*citing Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor.")).

Plaintiff is likely to succeed on the merits in this case. In a traditional public forum, like the sidewalk in this case, the government may institute reasonable "time, place, and manner" restrictions on the use of amplification. Any content-based restrictions are held to the highest level of strict scrutiny which the City cannot possibly meet here. While the permit's restrictions on time-of-day and location are reasonable as applied to Plaintiff, the complaint-based restriction is a heckler's veto based on content, punishing speech simply because someone complains. Thus, that restriction on Plaintiff's permit is subject to strict scrutiny, which it clearly fails.

### A.  This Case Involves a Traditional Public Forum

Mr. Cantrell's speech takes place on a public sidewalk. A "'traditional public forum' is government property that has 'immemorially been held in trust for the

use of the public.' It is government property that has 'time out of mind . . . been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Keister v. Bell*, 29 F.4th 1239, 1252 (11th Cir. 2022) (internal citations omitted) (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015)). "The quintessential examples are streets and parks." *McDonough v. Garcia*, 116 F.4th 1319, 1323 (11th Cir. 2024). *See also Pleasant Grove City v. Summum*, 555 U.S. 460, 464 (2009); *McCullen v. Coakley*, 573 U.S. 464, 476 (2014); *Bloedorn v. Grube*, 631 F.3d 1218, 1231 (11th Cir. 2011). While loudspeakers are recognized as "indispensable instruments of effective public speech" with First Amendment protections, *cf. Saia v. New York*, 334 U.S. 558, 561 (1948), their use can certainly be regulated in light of "[t]he nature of a place." *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972).

When evaluating "a government regulation on speech in a traditional public forum, [the court] appl[ies] strict scrutiny." *Keister*, 29 F.4th at 1252 (citing *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)). This means "a government entity may subject speech in a traditional public forum to a time, place, and manner restriction only if its policy is "content neutral, narrowly tailored to achieve a significant government interest, and leaves open ample alternative channels of communication." *Bloedorn*, 631 F.3d at 1231 (cleaned up). For content-based restrictions, the standard is far more exacting. In those cases, the

Supreme Court requires "the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (quoting *FEC v. Wisc. Right to Life*, 551 U.S. 449, 464 (2007)). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional[.]" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2014).

B.  The "Complaints Received" Standard Is Content-Based

A speech restriction is content-based if "a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys. That description applies to a law that 'singles out specific subject matter for differential treatment.'" *Barr v. Am. Ass'n of Political Consultants*, 591 U.S. 610, 618-19 (2020) (internal citations omitted). In the same vein, laws which regulate speech based on "emotive impact of speech on its audience," are also content-based. *Boos v. Barry*, 485 U.S. 312, 321 (1988).

Indeed, in the seminal Supreme Court case applying the First Amendment to public loudspeakers, *Saia v. New York*, the denial of the permit was predicated on "the ground that complaints had been made." *Saia*, 334 U.S. at 559. Citing prior cases striking down ordinances predicated on avoiding "riots, disturbances, or disorderly assemblage," the *Saia* Court held that relying on mere complaints could

easily "be made 'the instrument of arbitrary suppression of free expression of views on national affairs.'" *Id.* at 560 (citing *Hague v. CIO*, 307 U.S. 496, 516 (1939)).

> In this case, a permit is denied because some persons were said to have found the sound annoying. In the next one, a permit may be denied because some people find the ideas annoying. Annoyance at ideas can be cloaked in annoyance at sound. The power of censorship inherent in this type of ordinance reveals its vice.

*Id.* at 562.

The Supreme Court has reaffirmed this ruling time and time again. "Listeners' reaction to speech is not a content-neutral basis for regulation. Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992) (citations omitted). "It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592 (1969). To do so is a constitutionally forbidden "heckler's veto," when the government, rather than make the content-based distinction explicitly, merely "confers broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent" of the speech at issue. *Cf. Reno v. ACLU*, 521 U.S. 844, 880 (1997). "[T]he First Amendment does not allow a heckler's veto to proscribe protected activity 'based on 'perceptions' or 'discomfort.'" *Naples Pride, Inc. v. City of Naples*, No. 25-11756, 2025 U.S. App. LEXIS 17858 (11th Cir. June 6, 2025) (citing *Kennedy v.*

*Bremerton Sch. Dst.*, 597 U.S. 507 (2022)). "Speech cannot be financially  burdened, any more than it can be punished or banned, simply because it might offend a hostile mob*." Forsyth Cty.*, 505 U.S. at 134-135.

Most of Forest Park's permitting scheme is a classic time, place, and manner restriction: regulating the time of day and location of Mr. Cantrell's amplification use. This is, as applied to Mr. Cantrell at least, a reasonable restriction on the use of amplification. However, the provision allowing revocation or nullification of the permit upon receipt of *any* complaints—without objective criteria such as measured decibel levels or actual interference—transforms the scheme into a content-based regulation. This standard does not target noise as such (a facially neutral concern); instead, it empowers any listener, including one who finds the *message* objectionable, to trigger revocation simply by complaining. Such a mechanism is indistinguishable from the impermissible schemes condemned in *Saia*, where the Supreme Court held that basing a permit refusal on "complaints" risked suppressing ideas under the guise of noise control, *Forsyth County*, where fees escalated based on anticipated hostile reactions, and in *Boos*, where restrictions were justified by the audience's likely offense. The City's approach invites viewpoint-based censorship: opponents of Mr. Cantrell's religious or political message can silence him by lodging complaints, while neutral or supportive listeners would not. This is the essence of a heckler's veto, presumptively unconstitutional in a traditional public forum. *Reed*, 576 U.S. at 163.

The Complaint Restriction lacks any connection or basis in the underlying ordinance itself. To the extent the City may argue that the restriction is not a raw heckler's veto but rather a *trigger for investigation* to determine whether the objective ordinance standard is being violated, such an argument has no basis in the Complaint Restriction; that language on its face categorically ends any permit based on a complaint. The permit does not say that permits will be withdrawn if a complaint is made about noise that meets a specified threshold; rather a single complaint alone is enough to meet the standard. Read in its own words, the Complaint Restriction does not regulate decibels, volume, audibility, or any objective measure of sound. It provides that a permit becomes "null and Void" the moment "complaints are received." Period. Any complaint. From anyone. For any reason. That is a heckler's veto. Officers confirmed exactly that on July 31, 2025 — Lieutenant Sparks told Mr. Cantrell expressly that she was *not* measuring decibels and that *complaints alone* were the basis for enforcement.  When a citation was issued moments later, it was issued not because Mr. Cantrell's sound was measured and found to violate the 100-foot standard — it was issued because complaints had been received.

### C. The City's Regulation Cannot Survive Strict Scrutiny

Because the complaint-based revocation provision is content-based, it is subject to strict scrutiny. To survive, the City must prove that the restriction "furthers a compelling interest and is narrowly tailored to achieve that interest."

*Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (quoting *FEC v. Wisc. Right to Life*, 551 U.S. 449, 464 (2007)). The City cannot meet this demanding standard.

The City may assert a compelling interest in protecting public peace, preventing unreasonable noise, or minimizing disruption in public spaces. While reducing excessive noise in residential or commercial areas can be compelling in the abstract, the complaint-based mechanism here is not narrowly tailored to that end. A narrowly tailored regulation would rely on objective, content-neutral standards—such as decibel limits measured at a fixed distance, time-of-day caps beyond those already imposed, or requirements for repeated, verified violations— rather than delegating enforcement to the subjective displeasure of any listener. *See, e.g., Grayned*, 408 U.S. at 116-17 (upholding noise restrictions near schools that were tied to objective interference with activities, not listener reactions). The City's approach fails narrow tailoring because it is both overbroad (allowing revocation based on a single, potentially pretextual complaint unrelated to actual disruption) and underinclusive (permitting equally loud amplification if no one complains, even if it objectively disturbs others).

Moreover, the provision is not the least restrictive means available. The City could enforce content-neutral noise ordinances through police measurement and warnings, issue citations for objective violations, or require amplifiers to meet technical specifications—all without vesting veto power in hostile listeners. *Cf. Saia*, 334 U.S. at 562 ("Noise can be regulated by regulating decibels."). Precedent

firmly rejects listener-based triggers as a means of achieving noise control, as they inherently discriminate based on message. The risk of pretextual complaints turning the permit into a tool for suppressing disfavored viewpoints, such as Mr. Cantrell's religious message outside an abortion clinic, renders the restriction fatally flawed. In sum, the complaint-based restriction cannot withstand strict scrutiny. It is presumptively unconstitutional under *Reed* and fails every prong of the test. Plaintiff is therefore likely to prevail on his First Amendment claim.

D. <u>In the alternative, the City's Regulation is Not Narrowly Tailored.</u>

Even under the less demanding time, place, and manner framework, the Complaint Restriction fails. A content-neutral regulation must be narrowly tailored and leave open ample alternative channels. *Ward*, 491 U.S. at 791. The Complaint Restriction satisfies neither requirement. The provision is not narrowly tailored because it is not actually tied to any measurable governmental interest. The City's interest in noise control is legitimate — but the Complaint Restriction does not advance that interest by reference to any objective noise metric. It advances it by silencing speakers whenever anyone objects. Revoking permits based on sound that is louder than specified volumes would be a far more effective means to address the City's purported interest.

## II.   The Remaining Factors All Weigh in Favor of Injunction

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373

(1976). While mere chilling of Plaintiff's speech could be argued to fall short of this standard as mere "incidental inhibition," *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983), Mr. Cantrell has faced far more: the actual revocation of his permit for months and many more months of prosecution for the lawful use of amplification of protected religious and expressive speech. This is "direct penalization," not "incidental burden." *Id.* Forest Park has already silenced Mr. Cantrell for an extended period, inflicting concrete, ongoing harm to his core First Amendment rights that cannot be adequately remedied by money damages or later relief. Absent an injunction, this chilling and suppression will continue during litigation, compounding the harm.

"The balance-of-harms and public-interest factors 'merge when the Government is the opposing party,'" *Fla. Preborn Rescue, Inc. v. City of Clearwater*, 161 F.4th 732, 747 (11th Cir. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "The [C]ity has no legitimate interest in enforcing an unconstitutional ordinance. For similar reasons… [t]he public has no interest in enforcing an unconstitutional ordinance." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (citing *Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956 (5th Cir. June 1981). Here, the City's enforcement of the complaint-based revocation provision directly contravenes the First Amendment by enabling a heckler's veto and suppressing disfavored speech. The City cannot claim any cognizable harm from being enjoined from enforcing an invalid restriction; its asserted interests in

noise control or public order are fully preserved through content-neutral alternatives (*e.g.*, objective decibel limits). Enjoining the unconstitutional provision imposes no meaningful burden on the City while preventing continued violation of Plaintiff's rights. The public interest, in turn, strongly favors vindicating constitutional protections: the public benefits from robust free speech in traditional public forums, particularly on matters of public concern like religious expression outside controversial facilities. There is no countervailing public interest in permitting a municipality to wield subjective, listener-driven censorship.

In sum, because Plaintiff has demonstrated a strong likelihood of success on the merits of his First Amendment claim, the remaining preliminary injunction factors align decisively in his favor. The irreparable injury from ongoing suppression of protected speech is clear and presumptive in this context. The merged balance-of-harms and public-interest inquiry yields no legitimate governmental or societal stake in perpetuating an unconstitutional heckler's veto; indeed, the public interest demands swift relief to restore Mr. Cantrell's ability to speak freely. Courts in the Eleventh Circuit have consistently granted preliminary injunctions in analogous First Amendment cases to halt such deprivations pending full adjudication. *See Fla. Preborn Rescue*, 161 F.4th at 747; *KH Outdoor*, 458 F.3d at 1272. The temporary remedy of a preliminary injunction is warranted here to prevent further irreparable harm and uphold constitutional principles. The

Court should therefore enjoin enforcement of the complaint-based restriction and reinstate Mr. Cantrell's permit pending resolution on the merits.

## <u>CONCLUSION</u>

For the aforementioned reasons, this Court should grant the Preliminary Injunction.


Respectfully submitted this 26th day of March, 2026.


Andrew J. Ekonomou
Georgia Bar No. 242750
AMERICAN CENTER FOR LAW & JUSTICE
3286 Northside Parkway
Suite 1007
Atlanta, Georgia 30327
aekonomou@outlook.com

Liam R. Harrell*
D.C. Bar No. 1740309
Nathan J. Moelker*
Va. Bar No. 98313
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
(202) 546-8890 (phone)
(202) 546-9309 (fax)
lharrell@aclj.org
nmoelker@aclj.org
* *Pro hac vice* applications forthcoming